**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TAITWANA BOULWARE,** | : | |
| | : | |
| **Plaintiff** | | **CIVIL ACTION NO. 3:13-CV-1541** |
| | : | |
| **v.** | | |
| | : | **(JUDGE MANNION)** |
| **LIBERTY INSURANCE** | | |
| **CORPORATION,** | : | |
| **Defendant** | : | |

# M E M O R A N D U M

Pending before the court is the partial motion for summary judgment of defendant. (Doc. 18). Plaintiff's complaint, (Doc. 1-2), raised claims for breach of contract (Count I), and bad faith (Count II). Defendant now moves, pursuant to Fed.R.Civ.P. 56, for summary judgment only on the bad faith claim.

## I.    PROCEDURAL BACKGROUND

Plaintiff Taitwana Boulware alleges that her exterior deck and sunroom collapsed on March 4, 2012, at her property located at 15 Norman Court, Lot 21, Bushkill, Pike County, Pennsylvania, and that she sustained damages. Plaintiff had purchased a homeowners insurance policy from defendant Liberty Insurance Corporation ("Liberty") on November 9, 2011, which was in

effect on the day of plaintiff's loss.[1] (Doc. 1-2). The policy provided coverage to plaintiff's residence. Plaintiff notified defendant of her property damage claim on March 5, 2012, and made a demand for payment on her claim under the policy. After inspecting the property, defendant denied coverage to plaintiff on March 28, 2012, and refused to make any payment. (Id., ¶¶ 1-11). Plaintiff then brought the instant action in Lackawanna County Court alleging that the denial of her claim was a breach of contract and that defendant acted in bad faith, under 42 Pa.C.S. §8371, in denying her claim. On June 7, 2013, defendant removed this case to federal court. (Doc. 1). On July 19, 2013, defendant filed its answer to the complaint with affirmative defenses. (Doc. 8).

After the pleadings closed and discovery was completed, defendant Liberty filed a motion for partial summary judgment on July 3, 2014, regarding only plaintiff's bad faith claim. (Doc. 18). Defendant also filed its brief in support and its statement of material facts with exhibits. (Docs. 19, and 20). On July 25, 2014, plaintiff filed her brief in opposition and her answer to defendant's statement of material facts with exhibits. (Docs. 23, 24, and 25). On August 8, 2014, defendant filed its response to plaintiff's counter-statement of material facts and its reply brief. (Doc. 28, and 29).

---

[1]

The defendant Liberty Insurance Corporation was incorrectly named by the plaintiff in her complaint as Liberty Mutual Insurance. The court uses the correct name of the defendant herein.

Liberty's motion for partial summary judgment is ripe for disposition. This court has jurisdiction over this case based on diversity under 28 U.S.C. §1332. Based on the discussion below, the court agrees with defendant that plaintiff's bad faith claim, Count II, should be dismissed with prejudice.

## II.   FACTUAL BACKGROUND[2]

On March 4, 2012, plaintiff's Bushkill property sustained damage to the rear exterior deck and sun room when the deck collapsed. Defendant issued a homeowners insurance policy, H37-288-603361-700, to plaintiff for her Bushkill property with an effective date of November 9, 2011, and this policy was in effect at all relevant times. (Doc. 20-3). The loss was reported to defendant on March 5, 2012. The first claims adjuster who was assigned plaintiff's claim was Daniel Baron, a senior property loss specialist for defendant, and Baron spoke to plaintiff later on March 5. Baron checked the loss history on plaintiff's property and the circumstances of her present loss

---

2

The court notes that the facts of this case are derived from the statement of facts filed by the defendant as well as the plaintiff's counter-statement of facts and the responses of the parties thereto as well as the referenced exhibits submitted by the parties. (Doc. 20, 24, 28, 20-1 to 20-10, and Doc. 25-1 to 25-3).The court also notes that it directly relies upon Baron's, Ciuffo's and Scott's testimonies as opposed to the summaries of their testimonies and the extrapolations submitted by the parties in their statement of facts. (Doc. 25-1,and 25-2).

and made an appointment to go to plaintiff's property to examine the loss. Baron inspected plaintiff's property on March 7, 2012, and at the time, he knew plaintiff had an "H-3 policy", i.e., a standard homeowner's policy. Baron generally knew of the substance of what an H-3 policy was but he did not recall if he read through the actual policy issued to plaintiff before he inspected her property. However, Baron usually inspected the property and the loss before he read the insured's actual policy. Baron physically inspected the damage, for less than one hour, and took photographs and measurements of the damaged deck. Later on this day, he entered his summary of his inspection in the claims log. After his inspection, Baron had a conversation with plaintiff and he explained to her that "per policy exclusions for defective construction and wet or dry rot, there is no coverage for the loss." Baron did not look at the plaintiff's specific policy at the time of his inspection but, based on his handling of prior claims, as a senior property loss specialist, he knew the coverage and the exclusions for the type of policy which she had, i.e., an H-3 policy.[3] (Doc. 25-1, at 15, 18-19, 20-31).

Based on his inspection and his experience with the the H-3 policy, Baron

---

[3]

A copy of plaintiff's policy is attached to Baron's deposition transcript, (Doc. 25-1, at 84-125). Also, the photos Baron took, the claim log notes and the letters to which Baron refers in his testimony are attached to his transcript, (Doc. 25-1, at 65-83).

determined that there was no coverage for the plaintiff's loss since he found it was caused by "inadequate, improper, defective construction [of her deck], water dry rot deterioration." Baron personally performed the inspection and did not have any construction or engineer experts with him. Baron measured plaintiff's deck and found that the entire deck was 36 feet by 20 feet, and that the enclosed part of the deck was 18 feet by 20 feet. Subsequently on the same day of his inspection, Baron prepared a formal denial letter to send to the plaintiff regarding her claim. The parts of the letter referencing the policy language were cut and pasted out of a standard H-3 policy, not from plaintiff's specific policy. In his denial letter, Baron referenced sections of plaintiff's policy which he was familiar with based on his prior evaluations and he verified that those sections matched the sections in the policy actually issued to plaintiff. Baron did not have authority to have an expert look at plaintiff's deck and he would have had to get approval from his team manager at the time, Michelle Ciuffo. When he inspected the property, he did not request to hire an expert. (Id., at 31-37, 54-55).

After Baron drafted the denial letter, he sent it to his team manager for review, approval and mailing to plaintiff. On March 27, 2012, Ciuffo reviewed and approved Baron's denial letter which he drafted on March 7. Ciuffo did not hire a contractor or engineer prior to approving the denial of plaintiff's claim, nor did she suggest to Baron that he should send a construction expert or engineer to inspect plaintiff's deck. However, Ciuffo had experience with

property damage claims and with the construction of decks. She was employed with Liberty handling claims since 2005, originally as an inside adjuster and then as a personal property specialist, and she received training with Liberty, including training regarding the installation of decks on homes. (Doc. 25-2, at 7-9, 21-22, 27). Ciuffo did not visit plaintiff's property, but before she approved of the denial of plaintiff's claim, she reviewed the file log notes and the photos and discussed them with Baron. She also discussed the denial letter. (Id., at 13-15, 18-19, 25). Ciuffo further stated that she checked to see which policy plaintiff had, namely, an H-3 policy, as well as the endorsements applicable to coverage, but she did not review the specific policy issued to plaintiff. Based on this type of general policy, she checked to see whether Baron properly cited to the correct policy language and sections in his draft denial letter. Ciuffo stated that plaintiff's loss did not meet the portion of the policy dealing with collapse since just part of the deck fell. (Id., at 25-27).

After Ciuffo personally reviewed all of the information and photos, she then decided that Barons' proposed denial letter was appropriate since she concluded that there was no coverage because "the deck had fallen due to improper construction or faulty workmanship" as well as decay and dry rot. She also found that the deck fell due to improper attachment of the deck to the house by nails. This completed the involvement of Ciuffo with plaintiff's claim. (Id., at 16-20, 25-27).

On March 28, 2012, Baron mailed the denial letter to plaintiff and closed the claim. Defendant did not receive a response to the denial letter until October 19, 2012, when it received a "Letter of Notification" from a public adjuster firm, Metro Public Adjustment, on behalf of plaintiff. However, plaintiff maintains that she tried to contact defendant several times before October 19, to discuss the denial letter, but to no avail. Thus, plaintiff hired Metro Public Adjustment to pursue her claim. (Doc. 24, at 8).

The next entry in the claim log is October 19, 2012, which noted "Send for filed inspection due to PA [public adjuster] involvement." This note referred to Baron and directed him to reopen the plaintiff's claim since she hired a public adjuster to examine her claim. Baron reopened plaintiff's claim on October 19. Baron contacted plaintiff on October 19 and spoke to her about reopening her claim.  She indicated that she was not happy with the denial of coverage and confirmed that she hired a public adjuster. Baron said that he would wait to hear from the public adjuster. Three days later on October 22, 2012, he got the first phone call from the public adjuster, Larry Meyerhoffer. Baron received a second call from the adjuster on October 26. Meyerhoffer stated that he felt the plaintiff's loss was caused by a collapse and Baron did not agree based on his earlier analysis as set forth in his March 7 denial letter. Baron told Meyerhoffer he would send him a copy of this letter. Baron also re-evaluated his analysis of plaintiff's claim and reviewed the relevant documents, the log entries and photos. Baron further reviewed the claim with

his new team manager T.S. Scott. On October 31, 2012, Baron made entries in the log after reconsidering plaintiff's claim with Scott and determined that his prior denial was going to stand since they agreed that the cause of loss was wear, tear and deterioration, and that the loss did not fit the definition of collapse. On January 8, 2013, Baron then sent plaintiff's adjuster a second denial letter. Defendant did not receive any further correspondence from the public adjuster. Baron did not do anything regarding plaintiff's claim from October 31, 2012, until January 8, 2013, and after the second denial letter was sent out, he did not have anything further to do with her claim except for sending plaintiff's counsel a copy of her policy on February 5, 2013. (Doc. 25-1, at 38-45). Plaintiff then instituted suit against defendant on February 6, 2013.

Baron admitted that the only inspection of plaintiff's deck and her loss regarding her claim was his March 7, 2012 inspection, and that his determination at that time was there was no coverage due to "improper, inadequate, defective workmanship or construction" of the deck. In particular, Baron stated that the method of attachment of the deck to plaintiff's home was "with nails, instead of lag screws" and that there "was no Z flashing present." Additionally, Baron personally concluded that there was defective construction performed since there was rot in the deck boards which reasonably occurred since the Z flashing was not present. This allowed snow and water to rot out the boards over time, especially when it was an open deck before a structure

8

was later built on top of it. Based on his determinations and his investigation defendant Liberty denied coverage for plaintiff's claim. Baron personally told plaintiff at the time of his March 7 inspection that there was an exclusion to coverage in her policy and that there was no named peril for the personal property damages. Baron stated that plaintiff's loss was not caused by a "collapse" since, as defined in an H-3 policy, this meant "a sudden and entire falling down or caving in of a building" which did not occur to plaintiff's deck. Rather, Baron stated that he determined during his inspection that plaintiff's loss was simply caused by "a separation" of her deck from her home.

Baron could have hired a construction contractor with respect to plaintiff's claim without approval of his team manager if he thought it was necessary, but he required approval to hire an engineer. Scott did not hire a construction expert or an engineer to inspect plaintiff's loss although he had the authority to do so and he did not inspect plaintiff's property. However, Scott had previously worked as a contractor for several years and as an engineer officer (a Major) for the United States Army from 1998 until 2002. Scott also was involved with property loss claims on behalf of insurance companies for several years, namely, with Liberty since June of 2012 and prior to that, for 15 years with Farmers Insurance. When Scott first became involved with plaintiff's claim on October 31, 2012, he had all of the documents regarding her claim, including the original denial letter, the notes, the photographs, the log notes, all correspondence  and her policy. After the

second denial letter was sent out on January 8, 2013, Scott did not have any

further involvement with plaintiff's claim. (Doc. 25-3, 7-10, 17-19, 38-42).

The exclusion for wear and tear, and wet and dry rot in the plaintiff's

policy provided, in pertinent part, as follows:

SECTION I – PERILS INSURED AGAINST
COVERAGE A – DWELLING and COVERAGE B – OTHER
STRUCTURES
We insure against risk of direct loss to property described in
Coverages A and B only if that loss is a physical loss to property.
We do not insure, however, for loss:
* * *
2. Caused by:
* * *
e. Any of the following:
    (1) Wear and tear, marring, deterioration;
    (2) Inherent vice, latent defect, mechanical breakdown;
    (3) Smog, rust or other corrosion, mold, wet or dry rot;
    . . .

(Doc. 20-3, at 15).

The plaintiff's policy further provided an exclusion for faulty, inadequate

or defective construction and stated as follows:

SECTION I – EXCLUSIONS

* * *
2. We do not insure for loss to property described in Coverages
A and B caused by any of the following. However, any ensuing
loss to property described in Coverages A and B not excluded or
excepted in this policy is covered.

* * *
    c. Faulty, inadequate or defective:
        (1)  Planning,  zoning,  development,
        surveying, siting;
        (2) Design, specifications, workmanship,
        repair,  construction,  renovation,

10

remodeling, grading, compaction;
(3) Materials used in repair, construction, renovation or remodeling; or
(4) Maintenance; of part or all of any property whether on or off the "residence premises."

(Doc. 20-3, at 17).

In the March 7, 2012 denial letter, Baron also cited the policy language relating to collapse as contained in both the main policy and the amendatory endorsement.

The main policy issued to plaintiff contained the following provision regarding collapse:

ADDITIONAL COVERAGES
8. Collapse. We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:
    a. Perils Insured Against in COVERAGE C - PERSONAL PROPERTY. These perils apply to covered buildings and personal property for loss insured by this additional coverage;
    b. Hidden decay;
    c. Hidden insect or vermin damage;
    d. Weight of contents, equipment, animals or people;
    e. Weight of rain which collects on a roof; or
    f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. . .

(Doc. 20-3, at 13-14).

The amendatory endorsement to plaintiff's policy provided the following additional information regarding the above quoted collapse section:

**AMENDATORY ENDORSEMENT**

11

**THIS ENDORSEMENT CHANGES YOUR POLICY – PLEASE READ IT CAREFULLY**
THIS ENDORSEMENT SUPERCEDES ALL OTHER ENDORSEMENTS WHICH HAVE BEEN MADE PART OF YOUR POLICY AND REFERENCE THESE SAME PROVISIONS

**ADDITIONAL COVERAGES** is revised as follows:

\*\*\*

The following is added to Item 8. **Collapse**.

With respect to this Additional Coverage:
(1) Collapse means the sudden and entire falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied or used for its current intended purpose.
(2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.
(3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.
(4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(Doc. 20-3, at 39) (emphasis original).

After plaintiff commenced this lawsuit, plaintiff provided an expert report from David A. Hawk, Remodeling Specialist, dated May 21, 2014. Hawk, who had over 20 years of construction expertise, inspected plaintiff's deck and opined, in part, that the plaintiff's deck was constructed properly and that it "collapsed," as this term was defined in plaintiff's policy. Hawk also

12

determined that the cause of the collapse was the fact that the deck had been overloaded with weight, including the subsequent enclosure of half of the deck, furniture as well as the installation of a tile floor. Hawk also determined that the removal and replacement cost of plaintiff's deck was $38,900. (Doc. 20-9).

Additionally, after plaintiff filed this lawsuit, defendant had her claim reviewed and her property inspected by an engineer, Jody F. DeMarco, P.E., of Forensic Consultants of North America, LLC. DeMarco reviewed several documents regarding plaintiff's claim, including the photographs, the log notes, her deposition, Hawk's report as well as notes and photographs from his own site investigation on April 8, 2014. DeMarco prepared a report dated June 20, 2014, and concluded, to a reasonable degree of engineering certainty, that the cause of plaintiff's loss was improper construction of her deck, including improper installation of flashing and the use of nails as opposed to lag bolts to connect the ledger board to the rim joist, leading to rust  and corrosion of the nails as well as rot of the rim joist. (Doc. 20-10).

## III.   STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c);

13

see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Casualty & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249 ; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is

14

some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

## IV. DISCUSSION

Defendant argues that this court should grant it summary judgment on plaintiff's bad faith claim since plaintiff failed to show by clear and convincing evidence that there was no reasonable basis for denial of her loss claim. In her complaint, (Doc. 1-2), plaintiff alleges that defendant acted in bad faith by denying her coverage and by refusing to pay her loss under the policy. Specifically, plaintiff alleges that defendant did not possess "evidence that the damage to her deck and sunroom [was] a direct result of wet dry rot, wear and tear, deterioration and/or faulty, ineffective or defective workmanship or construction", and that defendant had "no reasonable and sufficient basis to deny [her] claim." (Id., ¶'s 19-20).

15

Initially, since this federal court has diversity jurisdiction over this case, it applies Pennsylvania state law. Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817 (1938)).

As both parties recognize:

> 'Bad faith' on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.,* good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005) (*quoting* Terletsky v. Prudential Prop. and Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. 1994)). To succeed on a bad faith claim, a plaintiff must demonstrate "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." Verdetto v. State Farm Fire & Cas. Co., 837 F. Supp. 2d 480, 484 (M.D. Pa. 2011), *aff'd*, 2013 WL 175175 (3d Cir. Jan. 17, 2013) (*quoting* Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997)). Mere negligence, however, is not sufficient to establish a bad faith claim. *See* id. (*citing* Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d Cir. 1994)). In addition, a plaintiff must demonstrate both elements of a bad faith claim by clear and convincing evidence. *See* id.

16

For an insurance company to show that it had a reasonable basis, it need not demonstrate its investigation yielded the correct conclusion, or that its conclusion more likely than not was accurate. Krisa v. Equitable Life Assur. Soc., 113 F.Supp.2d. 694, 704 (M.D. Pa. 2000). The insurance company also is not required to show that "the process by which it reached its conclusion was flawless or that the investigatory methods it employed eliminated possibilities at odds with its conclusion." Id. Instead, an insurance company must show it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action. Id.

"The 'clear and convincing' standard requires that the plaintiff show 'that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith.'" J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 367 (3d Cir. 2004) (*quoting* Bostick v. ITT Hartford Group, Inc., 56 F.Supp. 2d 580, 587 (E.D. Pa. 1999)). The plaintiff's burden is equally high at the summary judgment stage of litigation, and plaintiff must point to evidence that meets this heavy evidentiary requirement. J.C. Penney, 393 F.3d at 367 (*citing* Kosierowski v. Allstate Ins. Co., 51 F.Supp. 2d 583, 588 (E.D. Pa. 1999)). Further, "[i]n a bad faith case, summary judgment is appropriate when there is no clear and convincing evidence that the insurer's conduct was unreasonable and that it knew or recklessly disregarded its lack of a reasonable basis in denying the claim." Bostick v. ITT Hartford Group, Inc.,

17

56 F.Supp.2d 580, 587 (E.D.Pa. 1999) (citation omitted).

Pennsylvania's bad faith statute, 42 Pa.C.S. §8371, outlines actions a

court may take should it find that an insurer has acted in bad faith:

> In an action arising under an insurance policy, if the
> court finds that the insurer has acted in bad faith
> toward the insured, the court may take all of the
> following actions:
> (1) Award interest on the amount of the claim from the
> date the claim was made by the insured in an amount
> equal to the prime rate of interest plus 3%.
> (2) Award punitive damages against the insurer.
> (3) Assess court costs and attorney fees against the
> insurer.

"Pennsylvania law does not limit bad faith claims to unreasonable

denials of coverage[]" and, "[a] bad faith can have various other bases,

including an insurer's lack of investigation, lack of adequate legal research

concerning coverage, or failure to communicate with the insured." Davis v.

Allstate Property and Cas. Co., 2014 WL 4857434, *9 (E.D.Pa. September

30, 2014) (citing Coyne v. Allstate Insurance Company, 771 F.Supp. 673, 678

(E.D.Pa. 1991); Smith v. Allstate Insurance Company, 904 F.Supp.2d 515,

524 (W.D.Pa. 2012)); Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193

F.3d 742, 751 n. 9 (3d Cir. 1999) (a bad faith claim includes "a frivolous or

unfounded refusal to pay, lack of investigation into the facts, or a failure to

communicate with the insured.").

Plaintiff bases, in large part, her bad faith claim on the fact that the only

on site inspection of her loss, prior to the instant litigation, was performed by

Baron on March 7, 2012, who was only at her property for less than one hour. Additionally on the fact that defendant did not retain any contractor experts or engineers to inspect her damage despite the fact that its adjusters and supervisors had authority to do so. In fact, plaintiff points out that during the entire claims process, defendant failed to utilize a contractor expert or engineer to assist it to properly evaluate her claim and examine the cause of her loss, and that defendant should have retained such experts before it issued the two denial letters. It was certainly within the discretion of Baron, Ciuffo and Scott to retain an expert or engineer. However, based on their backgrounds in handling property loss claims and with construction, as well as Baron's personal investigation of plaintiff's loss, it can hardly be said that their decisions were unreasonable or that they knew an expert or engineer was required to properly evaluate plaintiff's claim yet recklessly disregarded this in denying her claim.

Moreover, based on his March 7, 2012 inspection, Baron determined that there was "improper, inadequate, defective workmanship or construction" of the deck, and he stated that the method of attachment of the deck to plaintiff's home was "with nails, instead of lag screws" and that there "was no Z flashing present." Additionally, Baron concluded that there was defective construction of plaintiff's deck since there was rot in the deck boards caused by the lack of Z flashing which allowed snow and water to rot out the boards over time. Baron personally viewed the areas of rot and took photos of the

areas, and his photos substantiated his findings regarding the use of nails and the deteriorating boards. Indeed, Baron's March 7 findings were entirely consistent with the opinions of the engineer expert defendant retained after this case was filed in court, namely, DeMarco. As defendant indicates, (Doc. 29, at 8), the retention of an expert by the insurer after denying a claim is not bad faith and, that even if the insurer erred by not retaining an expert to examine the damage prior to the initial denial of a claim, this amounts to only negligence or poor judgment and not bad faith. *See* Hamm v. Allstate, 908 F.Supp.2d 656 (W.D.Pa. 2012); (citing Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005) (mere negligence or bad judgment is not bad faith).

In any event, it was reasonable in this case for Liberty to issue the March 7 denial letter without first hiring an expert to investigate the damage. Even though the expert hired by plaintiff for litigation, i.e., Hawk, issued a report finding that her deck collapsed as defined in her policy and that her damage was covered, this only creates an issue of fact as to plaintiff's breach of contract claim not her bad faith claim. The defendant performed a reasonably detailed investigation of plaintiff's claim notwithstanding the lack of an expert, and it supplied a reasonable basis to bolster its denial of her claim on two occasions.

Plaintiff also argues that defendant's adjuster and supervisors failed to review her specific policy before issuing the denial letters, and Baron simply

20

cut and pasted the March 7, 2012 denial letter from denials he issued regarding prior claims of other insureds. Baron's testimony, as detailed above, shows that he was well aware of the provisions in a standard H-3 policy as well as the exclusions in the H-3 standard policy when he inspected plaintiff's property and drafted his first denial of coverage letter for plaintiff's claim. In fact, Baron personally told plaintiff at the time of his March 7 inspection that there was an exclusion to coverage in her policy and that there was no named peril for the personal property damages. Baron stated that plaintiff's loss was not caused by a "collapse" since, as defined in an H-3 policy, this meant "a sudden and entire falling down or caving in of a building" which did not occur to plaintiff's deck. Rather, Baron stated that he determined during his inspection that plaintiff's loss was simply caused by "a separation" of her deck from her home and that this was not covered under her policy. Upon reviewing Baron's March 7 denial letter, Ciuffo stated that she checked to see which policy plaintiff had, namely, an H-3 policy, as well as the endorsements applicable to coverage, but she did not review the specific policy issued to plaintiff. However, Ciuffo stated that based on the general H-3 policy, she checked to see whether Baron properly cited to the correct policy language and sections in his draft denial letter. Ciuffo concurred with Baron's conclusion and found that plaintiff's loss did not meet the portion of the policy dealing with collapse since they did not consider her deck as collapsing because the whole building did not fall, just part of the deck fell. Additionally,

21

when Scott, Baron's subsequent team manager, became involved with plaintiff's claim on October 31, 2012, he had all of the documents regarding her claim, including the original denial letter, the notes, the photographs, the log notes, all correspondence and her actual policy. Scott discussed plaintiff's loss with Baron and he reviewed the definition of collapse in her policy and, they both agreed that the cause of her loss was "wear/tear/deterioration" and that her loss "[did] not fit [the policy] definition of collapse."

"Under Pennsylvania law, an insurer may be liable for bad faith if it fails to make a good faith investigation into the facts of a claim, or engages in a frivolous or unfounded refusal to pay proceeds of a policy." Hall v. Nationwide Mut. Ins. Co., 2012 WL 5381426, \*7 (W.D.Pa. October 31, 2012) (citing Brown v. Progressive Ins. Co., 860 A.2d 493, 501 (Pa.Super. 2004)). "Ultimately, the insured must show that 'the insurer breached its duty of good faith through some motive of self-interest or ill will.'" Id. (quoting Brown, 860 A.2d at 501).

In light of the aforementioned facts of record in this case, the court finds that defendant conducted a prompt and reasonably thorough investigation of plaintiff's loss claim, and that defendant provided plaintiff with a reasonable basis for denying her claim. See Quaciari v. Allstate Ins. Co., 998 F.Supp. 578, 581 n. 3 (E.D.Pa.1998) (a insurer may prevail at the summary judgment stage with respect to a bad faith claim by "affirmatively demonstrating a reasonable basis for its actions.").

## V. CONCLUSION

Based on the record, the court finds no material questions of fact exist and, that defendant did not handle plaintiff's claim in bad faith and with an improper motive. As such, the court will grant defendant's partial motion for summary judgment, (Doc. 18), regarding plaintiff's bad faith claim. Plaintiff's bad faith claim, Count II of her complaint, will be dismissed with prejudice. An appropriate order will be entered.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: March 17, 2015**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-1541-01.wpd

23